STATE

v.

**Thomas P. BOWLING.**

No. 89–215–C.A.

Supreme Court of Rhode Island.

Jan. 31, 1991.

James E. O'Neil, Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., for plaintiff.

Lauren E. Jones, Jones Associates, Providence, for defendant.

## OPINION

KELLEHER, Justice.

On June 7, 1986, Peter Brown (Brown), a resident of Pawtucket, retired at about 9:30 p.m. A short time later, he awoke to the sound of fire trucks outside his building. When he went outside to investigate, he soon learned that there had been a fire in a dumpster behind an adjacent apartment building located at 502 Pawtucket Avenue (apartment building). Brown also noticed his neighbor Thomas P. Bowling (Bowling), a resident of 502 Pawtucket Avenue, with the firefighters.

When Brown returned home, he observed Bowling driving his car on Pawtucket Avenue and then saw him turn around and park the vehicle in front of the apartment building. A short time later Brown left the premises and walked his dog. As he passed by the apartment building, he noticed smoke coming out of a side entrance. Brown watched as Bowling ran into a side entrance and emerge therefrom ten to fifteen seconds later. At this point Bowling was coughing and choking.

Firefighter Ronald Doire (Doire) was a witness at the trial. Doire explained to the jury that he responded to a call of a building fire at 502 Pawtucket Avenue. As he entered the hallway of the apartment building, he discovered an individual who had been overcome by smoke. This individual later was identified as Bowling. Doire assisted Bowling out of the apartment building and returned to combat the fire.

When Inspector Donald Byrne (Byrne), a representative from the State Fire Marshal's Office, arrived at around 1 a.m., the fire was still burning. Byrne testified that based upon his observations, his belief was that the fire had been burning anywhere from one-half to three-quarters of an hour before it was discovered. This witness reported that the fire was discovered at about 11:46 p.m. Byrne also testified that the fire was incendiary in nature and not accidental.

Thomas Miguel (Miguel) resided in the apartment building and was related to Bowling.[1] Miguel testified that as he was preparing to go out that evening, he heard his daughter, Tammy, scream. As he ran outside, Miguel observed Bowling holding a flaming bag. When Miguel asked Bowling what he was doing, Bowling replied, "I'll pay the son of a bitches back, raising my

---

1. Bowling had a common-law marriage with Doris Palmieri (Palmieri). Palmieri's daughter, Angelina, was married to Miguel. Miguel and Angelina had a daughter named Tammy.

rent." Miguel said, "I'm taking my daughter out of this house." Bowling then replied, "the best thing you can do is take your family out of here."

A few days after the fire Tammy gave a statement to the police in which she indicated that she had watched as her grandfather attempted to throw some lighted paper into a vent leading into the first floor of the apartment building. In addition Tammy also reported that Bowling told her that he was going to set the building on fire because the landlords, Mildred and Gerald Coutu, had raised his rent. However, Tammy later changed her story at trial and indicated that she had lied in her earlier statement.

Mildred and Gerald Coutu also testified at trial. Mildred Coutu said that she received a telephone call at 7:50 p.m. on the evening of the fire. Although the caller was slurring his words, Mildred Coutu recognized the voice as belonging to Bowling, who was one of her tenants. Bowling complained about an increase in his rent and demanded that it be lowered. When Mildred Coutu told Bowling that he was free to move out, Bowling threatened her with a lawsuit.

The following day the Coutus went to the apartment building to survey the damage and clean up the debris. As Miguel and Tammy approached them, Mildred Coutu testified, Tammy said, "[Bowling] did it, didn't he?  * * *  He said that he was going to do this, set the house on fire." Gerald Coutu testified that Miguel had told Bowling that "you could get twenty years for this" in a conversation regarding the fire.

The final character in this drama was Palmieri, Bowling's common-law wife. Palmieri gave a written statement to the police a day after the fire. The statement related that on the night of the fire Bowling picked up Palmieri along with her sister, Jeannette Fagundes (Fagundes), and a friend at a club in Providence. The quartet then drove back to the Pawtucket Avenue apartment building. Upon entering the apartment building, Bowling told Palmieri that she should not sleep in the apartment build-

ing that night. A short time later the building was on fire. Palmieri died of causes unrelated to the fire in 1986.

In early November 1986 Bowling made a motion for discovery and inspection. The Palmieri statement was part of the information package that the state delivered to Bowling. Later that same month the state also sought discovery and inquired whether Bowling was going to rely on the defense of an alibi. This request demanded, among other things, "[a] statement as to whether the defendant intends to rely on the defense of alibi, if the defendant does intend to so rely, furnish[ing] with specificity the place the defendant claims to have been at the time or times of the alleged offense and the names and addresses of all witnesses he intends to call at trial to establish such alibi."

Pursuant to Rule 16(c) of the Superior Court Rules of Criminal Procedure, the state provided to Bowling both the date of the offense and the place of the offense. The state alleged that the fire occurred on June 7, 1986, between 11 p.m. and midnight.

After discovery proceedings ended, the trial began. After the state rested, Bowling's counsel submitted a belated response to the state's discovery request. This response came almost two years after the state's initial request and once the state had rested.

The defense notified the state that Bowling intended to rely on an alibi. Bowling's attorney stated that Fagundes would testify that on the evening of June 7, 1986, she, her sister (Palmieri), and a roommate were in Providence, at the Lithuanian Club on Smith Street. Sometime after 10 p.m., Bowling picked up the threesome and drove them to Fagundes's house at 965 Chalkstone Avenue where Fagundes and her roommate were dropped off. Bowling and Palmieri then returned to the apartment building on Pawtucket Avenue.

The state objected to any introduction of evidence of alibi at that point. The trial justice then called a recess and considered whether he was going to permit the testimony of Fagundes. The trial justice noted

that Rule 16 "is not a one-way street." That is, whereas a defendant has a right to submit exculpatory evidence, the state has the reciprocal right to discovery, "including possible alibi information within the prescribed time limits." The trial justice then imposed the discovery sanction and excluded Fagundes's testimony.

Subsequently a jury found Bowling guilty. The trial justice sentenced Bowling to twenty-five years in prison with fifteen years to serve and ten years suspended with probation. Bowling appeals from this conviction of first-degree arson.

Bowling claims that the trial justice committed error in excluding Fagundes's testimony at trial. Bowling bases his challenge on two independent grounds. Bowling first claims that the trial justice erred with respect to state law in imposing the discovery sanction and excluding the alibi testimony. Bowling also argues that the trial justice committed constitutional error in not allowing the Fagundes testimony. Each of these claims will be addressed.

■ The first issue is whether the trial justice erred in imposing the discovery sanction and excluding Fagundes's testimony. This court has adopted a four-part test to determine whether a discovery sanction is appropriate. The test considers (1) the reason for the nondisclosure, (2) the extent of prejudice, (3) the feasibility of rectifying the prejudice by a continuance, and (4) any other relevant factors. *State v. Leddy*, 555 A.2d 356, 358 (R.I.1989); *State v. Boucher*, 542 A.2d 236, 241 (R.I.1988); *State v. Ricci*, 472 A.2d 291, 299 (R.I.1984).

■ Bowling's counsel attributes the delay in disclosing the alibi evidence to the testimony of Inspector Byrne. Bowling's attorney claims that until Byrne testified, there was no evidence concerning when the fire started. As noted earlier, Byrne testified that the fire started thirty to forty-five minutes before it was discovered. Byrne also said that he believed the fire was discovered at 11:46 p.m. This would estab-

lish the starting time of the fire as 11:01 to 11:16 p.m. This fifteen-minute time frame falls within the state's request of an alibi that stated 11 p.m. to midnight as the time of the offense. Thus the Byrne testimony affords no excuse for the delay of nondisclosure, as the state had requested notification of Bowling's intent to use an alibi almost two years before he claimed the alibi.

In addition, Palmieri's statement notifying Bowling's counsel of Fagundes's identity was also made available almost two years before trial. This notification, coupled with Bowling's actual knowledge of Fagundes's existence and whereabouts,[2] makes any reason for nondisclosure unacceptable. Lastly, even if it took Byrne's testimony to bring the alibi to light, Bowling's counsel waited five days before notifying the state of the desire to put forth alibi evidence. In the span of these five days, the state had put forth its entire case and had rested.

We must also consider the extent of prejudice to Bowling. Although it is true that Bowling was prejudiced by the exclusion of Fagundes's testimony, we note that the jury could have chosen not to believe such testimony. More importantly, any prejudice to Bowling was largely self-inflicted. The Palmieri statement was in Bowling's possession as of November 1986, and Bowling knew about Fagundes.

The third aspect of the test requires us to consider the possibility of rectifying the prejudice by issuing a continuance. In this case the trial justice based his sanction largely on the fact that the state had already rested. That is, the trial justice believed that Bowling "seized upon this [alibi] having heard the state's entire case and [after] the state had rested." Thus, the trial justice properly felt that a continuance was not feasible.

We must also consider other relevant factors. The trial justice properly noted the prejudice to the state if the Fagundes testimony was allowed. The trial justice

**2.** It was Bowling who notified his counsel of Fagundes's place of employment, where counsel found Fagundes to be working.

pointed out that pursuant to the rules of discovery, Bowling was obligated to inform the state of any intention to use an alibi defense even if the identity or whereabouts of the witness was unknown.

We believe that the trial justice touched all the bases in imposing the discovery sanction. *See State v. Leddy*, 555 A.2d at 358. We see no reason to disagree with the trial justice's conclusion that Bowling employed a last-minute switch in tactics. *Id.* We therefore conclude that the trial justice did not err in excluding the Fagundes testimony.

We now move on to the second argument put forth by Bowling. Here, Bowling claims that the trial justice's discovery sanction violated Bowling's Sixth Amendment right under the Compulsory Process Clause. After consideration we reject this argument as well.

■ Under the Compulsory Process Clause of the Sixth Amendment of the United States Constitution, the criminal defendant has the right to present his own witnesses to establish a defense. *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967) (incorporating the Compulsory Process Clause of the Sixth Amendment into the Due Process Clause of the Fourteenth Amendment). The Compulsory Process Clause, however, does not vest a defendant with the power to offer testimony free from the requisites of the adversarial system. *United States v. Nobles*, 422 U.S. 225, 241, 95 S.Ct. 2160, 2171, 45 L.Ed.2d 141, 155 (1975).

As the United States Supreme Court pointed out in *Taylor v. Illinois*, 484 U.S. 400, 415, 108 S.Ct. 646, 655–56, 98 L.Ed.2d 798, 814 (1988):

"A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of crossexamination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony."

■ In this controversy the trial justice heard Bowling's arguments in support of the failure to disclose the identity of Fagundes until after the state had rested. The trial justice concluded that Bowling seized upon the alibi defense after having heard the state's entire case. The trial justice then imposed the discovery sanction and refused to allow the Fagundes testimony into evidence. Given the constitutional standards involved, we do not believe that the exclusion of the alibi testimony violated Bowling's Sixth Amendment right under the United States Constitution. *See Taylor v. Illinois*, 484 U.S. at 415–16 nn.20, 21, 108 S.Ct. at 656 nn.20, 21, 98 L.Ed.2d at 814–15 nn.20, 21.

In summation we believe that the trial justice did not err in imposing the discovery sanction and excluding Fagundes's proffered testimony. Bowling's appeal is denied and dismissed. The judgment of conviction is affirmed.